We appreciate everybody getting here. I know, for me anyway, yesterday was a challenge with the air and air travel. Hopefully everyone made it and ready to go. I think we have seasoned attorneys here who are well aware of the rules, but I'll just remind you that we have the light system, green light, you can keep talking, yellow light means you need to wrap up, red light, cut it short. Unless we keep you up here, we get to do that, you don't. That's just kind of how it is. Please give us record sites if you are referring to somewhere in the record, and please recall that rebuttal is for rebuttal only and not to bring up something new. And with that, we will begin with United States v. Ramos, 17-41274, and we'll hear from Mr. Canales. Good morning, Your Honors. May it please the Court and the counsel. I'm going to focus on two of the issues today, the first one being the exclusion of jury number 13 and the ineffective assistance of counsel issues that were raised in the brief. A court abuses its discretion only when its ruling is based on erroneous view of the law or clearly erroneous assessment of the evidence. That's U.S. v. Edwards. In this particular case before the Court, the Court violated Mr. Ramos' Sixth Amendment right to a unanimous jury and his Fifth Amendment right to due process when an erroneously dismissed juror 13. Now, I know that the Court has the discretion to dismiss a juror, and it's within the Court's discretion whenever the judge becomes convinced that a juror's ability to perform his duties has become impaired. This Court in Virgil Moreno, U.S. v. Virgil Moreno, decided a case that was very similar to this case but is extremely distinguishable. In that particular case, the Court actually interrogated the juror. The Court found and spoke to that juror, and that juror was seeking to be dismissed. In this case, the Court never spoke to the juror. But we don't have any case with a bright-line rule requiring interrogation of the dismissed juror. No, you don't. Right? So, you know, I very much understand your concerns, and I share your concerns, but we have this issue of the fact that the person actually there, the judge actually there seeing the sites, does need a little room to move because you've got a dynamic process when you have a trial and the judge is having to weigh a lot of things. And so we give discretion to the judge because of that. And why should we upset that discretion even if we might have handled it differently had we been the trial judge? I don't disagree with the Court. What I will say is in this case it's particularly distinguishable, and the reason being is because there was an impasse. This juror, when he became known to the Court, was a hung juror. He was holding the conviction. And so the minute the Court becomes aware that this man is the linchpin for potentially a hung juror or a hung jury, then it becomes extremely important. And I think the judge kept saying he didn't know how this juror would rule. Of course, we do have the situation of the notation about Perez, so that's a little bit contradictory. But the judge said that, so are we not to give some credence to the judge's own perspective that I don't know how this, you know, I don't know the situation, I don't know that this juror is the holdout? I would refer the Court to, I believe it's the last. I apologize, Your Honor. It is day eight of the trial, and it's in page 18 of the record where the Court goes on in discussing these issues with counsel and speaking to them, and there's no question from the record that we know who's hanging, who the only dissenting juror is. The foreperson makes it extremely clear. But do we know this? I mean, the foreperson makes it clear that this guy is not considering the evidence, but does that necessarily mean there isn't someone else in the room who has considered the evidence and is arguing for not guilty? So he's saying under the evidence Mr. Ramos didn't do that or didn't do this and is engaging properly, whereas juror number 13 is not engaging properly, so there may be more than one juror voting not guilty, but juror 13 is the one that's kind of the problem. And I believe that that argument could be made. I won't disagree that that is a real possibility, Your Honor, but the reality is – You're not accepting the premise that there was somebody who was not considering the evidence. All we know is that the foreperson said that there was a juror who was not considering the evidence. Isn't that correct? This particular juror, juror 13. So juror 13, and I believe, Judge, what I glean, Your Honors, from this record is that 27 or less than half an hour later, after that juror is dismissed, there's a conviction. And so – Well, I don't think there's any question this was the holdout juror. The question is what did the judge know when he decided to dismiss the alleged holdout juror or this particular juror? What did the judge know? Because the judge kept saying he didn't know how he would rule. Correct. And I don't want to assume that a judge is misstating things on the record in a criminal trial. I have no reason to do that. I would not make that assumption either. So then when we're judging the judge here, how can we say that, oh, the judge knew that he was depriving Ramos of a unanimous jury improperly? I think that's a great question. I believe that within the case law, with respect to dismissing that juror, we have to turn to Erwin B. Dowd, where the court makes three major findings in a Supreme Court case. And those findings, when dismissing a juror, it says the first premise – not in dismissing, I apologize. It says the first premise that we've got to look at that the court talks about in Erwin Dowd is regarding the preconceived notion regarding guilt or innocence. It says to hold the mere existence of any preconceived notion as to guilt or innocence of the accused without more is sufficient to rebut the presumption of prospective jurors' impartiality. So we already – even if a juror comes in and says it shows impartiality, we overlook that. We move forward under Erwin. The findings of impartiality have to be set aside only where prejudice is manifest. There's nothing that this judge did to establish that there was manifest prejudice. How about the – go ahead. Well, and I guess for me the statement that I don't know how a juror would rule is not the same as saying I don't know which way a juror is inclined to rule right now. I mean, wouldn't that be different? The judge says I don't know how a juror would ultimately rule. Well, I don't know how they're ultimately going to rule by the end of the deliberations. But that doesn't mean the judge has no indication what the juror's thinking is in the moment if the foreperson is saying this person is holding up the deliberations. I agree. I agree with you. And I believe that it was unquestionable. The discussions between the court and the foreperson and the record as it stands shows, in my opinion, that you can glean from the record clearly that the judge knew that this was the holdout juror. And I believe – and the actual facts as a – the conviction results 30 minutes later after. And so you're talking about something that I believe the record – it shows clearly what's going on. And so – Mr. Canales. Yes, sir. As recently as this year, hasn't this court recognized that even in the case of a holdout juror, a court can still dismiss that juror for good cause? Correct. Yes, sir. And I believe that – If a holdout juror had written a note that expressed bias in favor of the defense attorney, would that not be good cause? I agree that it potentially could be good cause. Well, we're reviewing whether it was an abuse of discretion. Well, and in – So would it be an abuse of discretion? I believe that it would be an abuse of discretion to never provide that note to defense counsel, to never even bring that note before the court, to never – on a piece of hearsay evidence that the court never saw, the court never looked at, just took the word of it. So you're saying the foreperson might have been mistaken on what the note actually said? Absolutely, Your Honor. Did the court question the foreperson? The court questioned the foreperson at length, and it was a leading interrogation by the court. Did the court – should we understand the court as having made credibility determinations as to the foreperson, in other words, saying, well, I believe you? I do believe that the court has that discretion, and I believe that the judge, who I have a great deal of respect for, has the ability to discern that. But I do believe – But what would be the reason not to ask for the note? The juror is there. The notes are there. Unless you absolutely are not going to conduct any investigation at all, what reason did the judge give for not asking for the note? Not give a reason, Your Honor. All right. There was no reason. And the note was discussed at length. And so one of the things that the court says is that he's dismissing him because he's refusing to review the evidence, and the record doesn't show that. The record shows from the foreperson saying we've shown the evidence. He decides to dismiss it. He decides to dismiss certain evidence, which means that the gentleman is actually – This is awfully nuanced because you could get up and testify that the light was red, and I could disregard what you said because I didn't believe you, or I could disregard what you said because I'm just not going to listen to the evidence. And that's the difference here, I mean, is which one was juror number 13 doing? Was he saying, I watched the witness. I just didn't believe him. He was sweating. I just – his story didn't make sense. I just didn't believe him. Or was he saying, don't bother me with the evidence. I'm tired. I have a headache. Just quit. I'm closing my ears. Which one was it? And that's sort of nuanced. I mean, the problem, like I said, is we're not there. We're not on the spot the way the district judge is. It doesn't mean we don't get to review the district judge. That's what we do. But it's why there is some – there is a lot of discretion in the judge. I don't disagree with you, Your Honor. I will tell you that what we do see is that the judge doesn't ask juror number 13 any questions. He never brings him forward knowing that this man, and I believe – Well, the one thing he did do, he talked to him earlier, and juror number 13 said he was being harassed. Yes, that's correct. So there is some interaction with juror 13 that would suggest that, I mean, kind of a 12 angry men situation. Yes, Your Honor. Before my time is up, if I could – Referring to the play, not anything else. Yes, Your Honor. Before my time is up, if I could address the final issue with respect to ineffective assistance of counsel. How can we address that on a direct appeal? I believe you can in this case. I believe that the record is sufficiently developed because the fact of the matter is defense counsel gets up and leaves the defense table during the United States government's case in chief when they've got the main witness on the stand. How on – in anybody's mind can that not be the clearest example of blatant ineffective assistance of counsel? He leaves for over 30 minutes. The record clearly reflects it, to go schedule something, and the judge allows him to do it. The judge allows him while he's sitting next to his co-defendant, which, by the way, the lawyer for the co-defendant is the only person that conducted any cross-examination. I have a problem, and I think he lodged the only objections with the exception of one. The only time that this lawyer actually spoke, he opened the door to character evidence, and the judge lets him know on the record how foolish it was, actually goes so far as to call his questions silly. The reality is I don't know of any court that could not evaluate an ineffective assistance of counsel claim when the lawyer leaves the courtroom during the direct – You still have to show prejudice even when the lawyer conducts himself below average. We'll just put it that way. You still have to show prejudice. I would say that prejudice is manifesting that your lawyer can no longer cross-examine the witness. He hasn't heard the testimony. He can't object to the testimony. He can't cross-examine him. He's denied his right to cross-examine under the Constitution to confront – to meaningfully confront that witness. If the lawyer's there, what do you do? You've been abandoned while the government can – basically has carte blanche authority to do and ask what they want without any objection. To me, the – But you're saying co-defendant counsel was there. He was, but, Your Honor, they are diametrically opposed. Fair enough, but, I mean, the government in running unabated to the goal line or to the quarterback or whatever the right – I would just submit to the court that in any event, when you do not – when there's the – one of the government's key witnesses is being cross-examined or direct-examined by the government and your lawyer's not there to even object, to even ask a question, to even know what the testimony was, I would say that that is ineffective assistance of counsel at its greatest breach of duty to your client. I know you want to talk about ineffective assistance of counsel, but the judge on day three of the trial, I think, dismissed the juror, which resulted in Juror 13 being seated. Is that right? I believe that Juror 13 – yes, correct. All right. So did the – the judge said he had a note or an email or an I don't remember what I got, but didn't the judge have something from a juror where the juror said I'm a co-worker of a witness slash victim in the case? That was the first juror that was dismissed, Your Honor. All right. And the judge wouldn't tell anybody who he got the note from. Did he say why? I'm not going to tell you which person sent me a note saying I probably shouldn't be on the jury. No, the judge doesn't elaborate on that, but he does beyond defense counsel's objections who are asking where did this come from, who said it. We need to know. The judge denies him that. Eventually, it's revealed and that jury is dismissed at the urging of defense counsel, but there's definitely a concern. That person was around for three days. Yes, sir. Did everybody agree that that juror should be dismissed? Eventually, I believe that that's what – There was a problem with – possible problem with respect to a juror who knew a government witness. It was brought to the attention of the court. There was a connection, a tangential connection between employment and somebody that was – And the government agreed to have the witness – to have the juror dismissed. To have the juror dismissed. After three days. After three days. Okay. You've reserved time for rebuttal. Thank you. Thank you, Your Honor. Ms. Mannis. Thank you, Your Honor, and may it please the Court. There's three issues in this appeal, but I think the central focus is on the court's dismissal of Juror 13. So I'll focus my discussion there, but I'd be happy to answer any other questions about the other two issues. I mean, isn't it a little bit of a problem that the – you know, the judge would like there to be a verdict because you don't like to sit there through a long trial and then have to do it again, and I'm not accusing the judge of anything improper, but isn't it a lot to be given discretion to this degree to a judge to dismiss the person that pretty clearly was the holdout? I don't agree, Your Honor. This Court has said time and again that even a holdout juror can be dismissed for just cause, and there was just cause here. In fact, there were three different legally relevant legitimate reasons for dismissing. In every case where that's happened, wasn't there an investigation? No, Your Honor. In some – You had a case where the Court did not conduct an investigation, but the Court dismissing a juror. Yes. Which one? United States v. Virgin Moreno involves a medical issue, and also United States v. Huntress involves a medical issue as well. Well, let's talk about the medical issue. I'm a little bit concerned about relying on that in an era where we are respectful of the fact that people with disabilities should be able to live a life and have access to the world the same way as everyone else as best they can. And frankly, I as a trial judge had a blind juror on my jury, and she served perhaps better than any of the other jurors, and the other jurors were very respectful of her, and it's one of the highlights, really, of my time as a trial judge to see how she served. So this assumption that somebody has a disability and they can't serve is concerning to me in an era where we are respectful of people with disabilities, or should be. Certainly as a court, we should not be saying, oh, you have a headache, you're disabled, you're out of here, or oh, you have some issues with memory. You can explore those in voir dire, but to discharge a juror for that? I mean, that's a little different from the person's in the hospital and won't come back for a month. I understand that. But here, this has a little bit of a tinge of disability discrimination that concerns me. Your Honor, I disagree. I actually think the trial court was very respectful to the juror's medical concerns. You can tell from the record that the judge had a discussion with the juror on that Thursday evening when he asked to be dismissed, not be dismissed, for deliberations to end for the day because of his headache. The juror expressed to the judge that not only did he have headaches, but he was disabled and unable to work. He spends a lot of time taking care of himself and gets tired easily. And then the juror also expresses to all of his fellow jury members that he has a disability, and the foreperson testifies that he has a short-term memory issue and he has an inability to grasp what's being understood. And if the medical concerns were the only reason that we were addressing, it would be a much closer case. But that's not the only basis for the dismissal here. Inversion Marino, the one you said there was no investigation conducted? Yes, Your Honor. In that case, didn't the judge talk to the juror who said they had the medical problem and discuss their medical problem with that particular juror? I believe he received a note from the juror and discussed with the juror off the record. That's not the same as talking to the juror? It is the same as talking to the juror, but there wasn't a full-blown evidentiary hearing where multiple jurors were. Well, I'm not talking about an evidentiary hearing. I'm talking about conducting some investigation from the person who allegedly has a complaint. Understood, Your Honor. In this case, when the foreperson relayed the information about his version of what was going on with juror number 13, did the judge talk to juror 13? Not after talking to the foreperson. However, the judge had just overseen a two-week trial, had had several interactions with juror 13, and was much closer to the ground and could understand what the dynamics were and could make the assessment of what type of investigation was needed at that point. And I think we need to credit the fact that the judge, we shouldn't view this incident in isolation. I don't view it in isolation. That's part of the problem, because part of my problem is it took him three days to deal with the juror, that he had a note or something, because he said he didn't recall, I guess, what he had or how he knew. But he revealed on the first day that there was a juror who said there's a witness victim who is my coworker. And he didn't even reveal that. He wouldn't reveal the name of that person to the parties. Is that right? Yes, Your Honor. That is correct. All right. So I'm not looking at it in isolation, in a vacuum. Part of my problem is all of the circumstances surrounding this jury. I understand, Your Honor. All right. And then I do understand with that first juror, the parties ultimately did come to an agreement that the juror should be removed, and Juror 13 was substituted in, and we recognize that. Were there other alternates? There was one other alternate, in fact. So if there was such a problem with Juror 13 that we're supposed to consider that that's part of the milieu of this case, then why not substitute Juror 14 and say, well, you know, Juror 13 has all these issues. I think we should just let him go and substitute Juror 14. That would have been better at the juncture before you know how everybody is going to rule. Certainly in hindsight. I think at the time the substitution occurred, we were not aware of all of the issues surrounding Juror 13. Some of them came up, obviously, during deliberations. And then when it became clear that Juror 13 should be dismissed for these legitimate reasons, the court attempted to find the second alternate, and they could not locate him or her. So the federal rules of criminal procedure do allow a jury of 11 to return a verdict, and that's what happened here. Ms. Maness, I just want to understand. You're not agreeing with Judge Graves that there was, quote, no investigation by the court into the problems with Juror 13, are you? I'm not agreeing with that at all. There was an investigation. And what did it consist in? Sorry? What did it consist in? It consists of, first, the judge's general knowledge of the trial and the deliberations up to that point. And it consists of the under oath discussion with the foreperson. And the foreperson testified extensively that Juror 13 was refusing to consider evidence. He was, quote, adamant about not looking at the evidence. He would be shown it and he would just dismiss it. The foreperson testified again and again that this was a problem in the jury, jury room, that the juror would not consider the evidence. And that's a legitimate reason for dismissal. In fact, that's the case. The foreperson was sworn? Yes. Yes, he was. Do we understand from the record that the court made credibility findings about the foreperson? Absolutely. But the juror was sworn, too. All of them were. They took an oath, right? Yes. To consider the evidence. Yes, Your Honor. All right. Yes. And to that point, I know my counsel on the other side has emphasized Ervin v. Dowd. That case dealt with outside influence, publicity on a jury. This is a different case. And the court has been really clear in Edwards and in United States v. Webster, which is cited in Edwards, that we treat differently outside influences on a jury versus inside influences. This is an inside influence. But that should actually argue in favor of the defense here because you generally aren't allowed to inquire into what's going on behind closed doors in the jury room. That's one of the most sacred spots, if you will, in our system. Exactly for the reason that people have a different way of – I mean, this is why we have jurors, 12 ordinary men and women, tried and true, who come there to just judge their peers. And so the whole idea is we're not going to delve too deeply. And as we discussed with counsel opposite, the fact is the difference between my saying, I disregard what you say and I disregard evidence, period, is kind of a fine – we as lawyers get it, but the ordinary person, I'm not so sure, that they would make that distinction. So Juror 13 could have said, I don't want to see that evidence, because Juror 13 thought that witness was lying or that evidence was not persuasive, not that Juror 13 was saying, I ain't considering any evidence, don't bother me with the facts. Right? Yes, Your Honor, and I think the approach that the district court took here respected the secrecy that we honor in the jury deliberations. The trial judge proceeded cautiously in investigating, and that's why we needed to – In fact, in a case called U.S. v. Ebron, 2002, this Court said, a court must limit its own inquiries of jurors once deliberations have begun, because we've recognized a strong interest in the secrecy of deliberations. Absolutely, Your Honor. The court in Ebron emphasized that there's a fine balance there, especially when deliberations begin, that you have to protect secrecy. You need to investigate juror misconduct, but you proceed cautiously, and that's what the Court here did. But this is kind of getting the benefit and the detriment of that. The judge was willing to inquire of one juror what they thought the other juror was thinking and doing, but not of the juror that was doing the thinking and the doing. I mean, why not bring Juror 13 and say, look, you took an oath that you're supposed to consider the evidence. Are you not willing to do that? That would have been very helpful, because I could look him in the eye and he starts shaking a little or not looking the judge back in the eye, so on and so forth, make credibility findings. But here they got half the information. They found out that Juror 13 had written this note, which we haven't seen. Juror 13 was not considering the evidence. Juror 13 had this short-term memory problem. All of that we're hearing from somebody else. So how is that respecting secrecy? It's exposing what one person views the world as. Your Honor, certainly the court could have put Juror 13 on the stand and questioned him as well. It didn't in this case, but the approach he took here was permissible and appropriate in scope under the record. Again, the judge has overseen a two-week trial. He's had interactions with Juror 13, and he recognizes that Juror 13 has discussed the medical issues extensively with the judge on the Thursday evening, and then he interacts with Juror 13 at one point in the hallway during deliberations, and he acknowledges on the record, listen, I don't think Juror 13 is credible. And so the judge has made — A discussion about the medical issue occurred the day before? Yes, Your Honor. Juror 13 was dismissed? Yes. The court received the note asking to adjourn for the day, and then the court had a discussion with Juror 13, offered him some Advil or Tylenol, and the juror disclosed — How is that an extensive discussion of the medical issues? It's actually — the court recounts it in the record. I believe it's at 2447, over to 2448. And the court said, listen, I didn't tell you this at the time. The juror disclosed much more to me than I needed. But he said — he advised the court that his health is a large issue for him. He spends his days caring for himself and making sure that his health is his first priority. That includes regular rest, taking various medications. So there was an extensive discussion. That could characterize a lot of people. We don't disqualify them from the jury. Yeah. Kind of back to my original point of the — and I'm not accusing this judge of disability discrimination, but I did find the briefing to suggest that that would be okay, and that just really concerned me. And we would — and to the extent any of my briefings suggested that, that's not at all okay. The juror here certainly could have preceded whatever his disability was, but there's an indication then from the foreperson that whatever his condition is, it's being exacerbated. He's having problems grasping and understanding what the other jurors are trying to communicate to him. And then again, it's not just the medical reasons. But he had already said he thought the other jurors were kind of, you know, bullying him. And, I mean, again, I don't mean to keep referring to 12 Angry Men. I just saw the play fairly recently. But you can see at the outside of that play how much they are beating up on the one holdout. And then by the end of the play, and close your ears if you haven't seen it and you want to go see it, it goes the other way, and the defendant is found not guilty. So we know the one holdout juror can become the person — I mean, again, I know that's a play. I don't mean to put too much talk into that. But I have had the experience of being the dissenting vote with a panel and then end up convincing my other two colleagues and vice versa. So it can happen that the one person who thinks something differently than everybody can persuade the others. And that's exactly why we have 12 jurors instead of one. I don't disagree, Your Honor. But, again, here, I think we should need to look at the totality of the circumstances. Counsel, here's my concern about the disability. Yes. I can't imagine that when the judge was going through the qualifying process to determine who was going to be seated on the jury, a question didn't come up about whether or not there was some health issue or anything like that that would render a person unable to sit on a jury. So unless those questions didn't come up, he would have had to develop a disability during the trial that prevented him from being able to deliberate that did not exist at the time that the judge was qualifying them to sit on the jury. You'd have to believe that something like that happened in order for him to now deem him disabled to sit in deliberations when during the course of the qualifying process to determine who was going to sit, there wasn't a disability. But let me get to what I'm really concerned about. The most compelling reason to get rid of that juror is if, in fact, there was a note like the one the foreperson claimed, at least in my view. I don't know about my colleagues. The most compelling thing to me would be a note that said Perez, number one. What else do I need to know? What else do I need to say? Explain to me how on God's green earth, if such a note exists in a case like this, nobody asked to see the note. Your Honor. Tell me how that happened. I will. I acknowledge defense counsel did ask for the note to be preserved after the verdict came back and the judge said, I don't think I can do that. I told the jurors their notes would be shredded. This is a very unusual situation. Well, when I say nobody asked, what I should have said is the person I'm most concerned about not asking. The judge didn't ask for the note. But it's certainly appropriate to consider a statement like that from a juror in deciding whether or not to excuse a juror from service. Oh, absolutely. How do you not ask for the note? I think there's a balancing act here that goes back to protecting jury deliberation. And you're doing a balancing act because the judge didn't tell us why he's not asking for the note, did he? He did not. All he said was that I told the jurors that I would shred their notes. But then you can't consider them, period, end of story. You can't have it both ways. You can't say, I'm going to treat your notes as totally confidential, but I'm going to dismiss you because of what you wrote on your note that I'm not going to look at. I just don't see that. That's considering evidence that's not before you. That's just fundamental to our system that you don't do that. Now, and I understand the tension, Judge, but if instead of writing it on his notepad, let's say that juror number 13 had said to his fellow jurors, Rick Perez is number one, what else is there more to say, I do think that that could be appropriately then before the court on a juror misconduct investigation. And so here, again, it's this tension where it was written, the foreperson saw it, he testified credibly to its existence, nobody questioned the notes. You know, that is a little bit different because when I'm, like, I'm writing notes right now, I'm not expecting that my colleagues are looking at them unless I write them a note. And so it's supposed to be for me. I mean, I'm not writing anything I don't want them to see. But if I did, I wouldn't expect them to look at it. And so if this is supposed to be confidential and he writes something himself and you're saying that he didn't share the note with others and they just saw it, then how is that consistent with this whole confidentiality of the notes to treat that as the determining factor to get rid of it? Again, I think it goes to you need an impartial jury. And when there's evidence of impartiality, that needs to be investigated. And the way the judge chose to investigate it here was through this. To believe the foreperson. To believe the foreperson, yes. He can make that. That was his investigation. He can make that credibility determination, yes. But more so to consider a piece of evidence the judge has said is confidential and shouldn't be considered and shouldn't be preserved. That's the problem with it. And to me that is having it both ways, to say I'm going to consider the note, but I'm not going to consider the note. I understand, Your Honor. And I'm not sure if. It's just like I'm not going to tell you about this note or email or letter or conversation or whatever it was, however he knew that a co-worker of a witness was on the jury. He wouldn't tell anybody how he knew that? I believe he did say that he received a call over the weekend or Chambers received a call over the weekend explaining the situation between the co-worker and the potential witness. Does the record reflect what the testimony of the foreperson was about the note, how the note came to light, how he saw the note, how others? What was the testimony? Yes, it does, Your Honor. Every juror was given a clear binder, and juror number 13's notepad was right in the clear binder, and the foreperson said, I saw the front page of that notepad, and it said Rick Perez is number one. What else is there more to say? And so the testimony does reflect how the foreperson saw that note. I think actually he said it was Perez, Rick. Perez, Rick, yes. Yes. So I left your diary on the table and I looked at it. But I don't think this is a diary. Yes, it is his notes, but it's part of the deliberative process, and the judge had to proceed in a sensitive manner. Just wholesale taking juror number 13's notepad probably would not have been proper. It's sensitive to the juror's concerns. Yes. At the expense of the defendant's concerns. No, again, I think there's a balancing act, which was recognized in EBRON that Judge Duncan raised. When there's allegations of juror misconduct, they need to be investigated, but you need to proceed cautiously. Well, in EBRON, there was an investigation. And what the court said is there shouldn't have been an investigation because the only information to form the basis for an investigation is that the jurors were disagreeing about the merits and the credibility of the witnesses, which is exactly what jurors are supposed to be talking about. Wasn't that the upshot of EBRON, that there wasn't a sufficient basis to launch an investigation based on what the foreperson said was the problem? Wasn't that what EBRON was about? I think the defense was complaining that the investigation was too broad that the foreperson testified and then the judge called in all of the other jurors. Ultimately, the court upheld the dismissal of the juror in EBRON, though. I see that my time is up. But the problem in EBRON wasn't that there was no investigation. We're talking about something different here. There was an investigation in EBRON. Yes, and there also was an investigation here, Your Honor, and I think the investigation was proper and permissible under this court's deferential standard of review. If there's nothing further, I see my time has expired. Thank you. She closed with the best sentence for her, deferential standard of review. We're stuck with that for better or for worse. I'm not disagreeing with the standard. It is the standard. How can you overcome that given all of the nuances and ups and downs and backs and forths of this? Your Honor, that's a great question. If I could start with addressing some of the points that were made until I can get there. Well, I think it's always better to address the question a judge asks you, but you're five minutes. Well, Judge, I think when you look at the totality of what happens in this case, when you look at the one-sided, for better or worse, investigation, I don't think that I would call it that, knowing what the judge knew, knowing that there was one holdout juror, knowing that when you use the reasons for medical reasons. Well, the gentleman sat there in a jury trial for eight days and never had any problems until they started deliberating and he wasn't falling in line. So I believe that there is an abuse of discretion. When you have this set of facts that you've heard and you can infer and you can know what's going on and the actual result is exactly what's before this court, 30 minutes later is your conviction. It speaks for itself. If you just look at the actions of everything around it, everything from the note to only talking to that one juror, the foreperson who allegedly saw this thing through a clear plastic bag and never once requests a note, you're talking about . . . Isn't there evidence that the juror knew defense counsel aside from the note? That the juror knew defense . . . I don't know that. I think that there had been . . . Went to high school together? I think in high school together, but yes, I think . . . So the answer is yes? Yes, sir. And so if ultimately when you look at the . . . Didn't the juror reveal that? The juror revealed that. Ah, so he was forthcoming with that. Yes, sir. They revealed that. He said, as I recall, correct me if I'm wrong, during voir dire, that he knew defense counsel from high school, but that he could be impartial. Yes, sir. Yes, sir. And when you . . . Well, do we know that Perez's number one conclusion came from high school, or do we know that it came from the trial? Maybe he just did a really good job at trial. I've had jurors say, you know, this lawyer was really good. Your Honor, I would submit to the court not trying to be facetious, but you could be the number one loser. But you could also be the number one based on your conduct at trial, and I don't know that that would make you biased as a juror to acknowledge that, look, that lawyer just creamed the other lawyer, just really undercut them in everything, and do I need to say more? I mean, that could be what he meant. We don't know. It could be that he was remembering him from high school and he was so fantastic in high school, or it could be that he is responding to the trial and the fact that this guy just blew everybody else away. Or it could be that he said to the court during voir dire that he could be impartial and he was not being candid with the court. That could very well be the case. And if that were the case, that would be justified dismissal for good cause, would it not? It would, Your Honor, but who's in the best position to know that? We're speculating about what it could be. We are. Because the judge never asked him anything about his alleged note. And he didn't ask him anything about the alleged note only after he learns of the fact that he is probably unquestionably the holdout juror, which we find out exactly that's what happened. The ultimate, the end of the argument is this. The court, by dismissing Juror 13, ensured a conviction. And that's the reality of the case before the court. And there was no investigation as to him with respect to anything else other than the foreperson. His medical issues, and I just wanted to address briefly that he asked for a break. It was 7 p.m. at night when he asked for a break. They had been there all day. Was there ever a time in the trial before that that he had some concern that, you know, caused them to have to take an extra break or anything? Not to my understanding, Judge. He was able to sit through full days of trial up until the late 7 p.m. And the complaint was a headache. Complaint was a headache. Yeah, which I get when I don't get my meds on time. And so, ultimately, I feel my time's up, but thank you for your time. Okay. Thank you. Your case is under submission. We appreciate both sides' arguments.